Good morning, Your Honors. We accuse the Court, Raquel Hess, on behalf of Petitioner José Juan Bautista Hernández, I'll call Mr. Bautista. I will be arguing for 8 minutes and will address the merits of the BIA's 6-29-2018 decision denying his motion to reopen. I make it counsel we use 4 minutes to address the merits of the BIA's decision denying his motion for stay of removal while his motion to reopen was pending, and I would like to reserve 3 minutes for rebuttal, please. Mr. Bautista is a citizen of Mexico. He's resided in the U.S. since 1991. His father was a U.S. citizen, but for the fact that he went to Mexico for a brief visit in 2004, he would have become a legal permanent resident many years ago. Instead, he was placed in removal proceedings, and in 2009, his request for cancellation of removal was denied. As an HIV-positive individual with a legal permanent resident spouse and 6 U.S. citizen-born children, Mr. Bautista requests that this Court grant his petition for review and remand to the BIA for a full review of his legal arguments. I'd like to focus on two arguments, the BIA's failure to address Mr. Bautista's equitable tolling argument and the BIA's failure to properly assess the changed country conditions. Regarding equitable tolling, Mr. Bautista provided sufficient argument to the BIA to demonstrate he was entitled to their consideration, whether equitable tolling should be applied to the filing deadline for his motion to reopen. The BIA acknowledged Mr. Bautista's tolling claim. However, it did not properly address whether Mr. Bautista's motion to reopen should be subject to tolling under this Court's standard for tolling claims, whether an extraordinary circumstance prevented timely filing of his motion, and whether he exercised reasonable diligence pursuing his case. Those are the questions that the BIA needed to address in order to properly adjudicate the matter before them. Instead, the BIA addressed a separate question, whether the procedural regulation governing motions to reopen applied to this case. But Mr. Bautista never disputed that he is subject to the requirements of H.C.S.R. 1002.3c. Well, counsel, I'm trying to remember, but isn't it possible that the BIA didn't address it? Because I don't think he ever used the word equitable tolling. If he didn't necessarily raise equitable tolling, I don't know. Well, he raised it sufficiently for the BIA to address it. In fact, they specifically say in a footnote that the respondent argues that his motion should be deemed timely. I guess I'm getting at it. It seems like your argument is that, well, the BIA didn't properly address this like they should have. But it seems to me your argument is also, well, the BIA did address it, which is fine. So you can reach a court. But, I mean, if the BIA didn't quite address it the way you want, it might be because he didn't raise it. You know, he didn't use the word equitable tolling. I don't think he even used the word equitable stop-all or anything, did he? No, the actual words were not used. But the idea, the timeliness of the argument, it's certainly there. And Sokok Gonzalez clearly makes it very clear that it's not necessary to use the actual wording of equitable tolling. I mean, we were under a lot of pressure because ICE was on its doorstep to deport him, and we had to submit this right away. And so the actual wording, you know, the ideas were there. And the BIA admits, they recognize that the ideas were there, but they don't do the proper analysis that they needed to do to address whether he should be given that benefit of equitable tolling. I mean, now we have the right wording, but I really don't think that that was necessary. In terms of the ideas being there, I want to make sure I understand what the idea is behind equitable tolling. Is the idea that he, you know, his cancellation was denied, his request for cancellation was denied by the BIA. He appealed to the Ninth Circuit. They went into mediation. And there was an agreement between the BIA and Mr. Bautista that he would get deferred status, deferred action status, in exchange for dropping his appeal. And so as long as he had deferred action status, he couldn't be taking any more action against, you know, to challenge his removal. Is that? And so it would have been unfair, it was unfair to say that his motion to reopen was untimely because he, of course, had to wait until after he was stripped of deferred action status to file a motion to reopen. Is that your equitable tolling argument, or am I misunderstanding it? Well, it is in part. But in part, the argument really is there was no reason for them to, for ICE to arbitrarily take away his deferred action. And at that point, there's an extraordinary circumstance that occurred because the deal. So you're, wait a minute, hold on. So you're saying, so again, I mean, I was having a little hard time wrapping my mind around your equitable tolling argument, and I think that I had construed it the way I just described it, which is drops his Ninth Circuit appeal in exchange for deferred action  There's, of course, no promise about how long that deferred action status is going to last. But so long as the, you know, he has deferred action status, he obviously can't continue to challenge his removal. Because that was sort of the deal that they reached, right? That, you know, in exchange for dropping his appeal, he would get this deferred action status. And that, so I understand that. But now you seem to be saying something like, well, your equitable tolling argument depends on the unfairness, the alleged unfairness of the decision to not to renew his deferred action status. And to the extent that your argument depends on that, I guess I'm having a hard time understanding. Because it's entirely up to the agency to decide whether to renew his deferred action status. Well, I don't agree that it's entirely up to the agency, because one thing is renewing it yearly as agreed with no other circumstance occurring, such as a criminal record that would make them stop renewing it. But another is to arbitrarily take it away when there was no circumstance that would permit, that would make that. Otherwise, you end up having this situation where they could make an agreement. Your deal was only to get deferred action status for a year without any promises of renewal and any promises that it wouldn't be renewed, that it would only decline to renew it if something in particular happened. Right. So it wasn't just for a year. It was a deal where it was expected to be renewed unless something intervened, such as a criminal record. Well, that might have been the expectation, but that wasn't the deal. I mean, the deal was just that he would go into deferred action status. I don't understand why. I mean, I guess I don't understand why you're focusing on that. It seems like you're going to probably have a hard time convincing anyone that the deal was anything other than to put him in deferred action status for a year, potentially subject to renewal without any conditions attached to that. But, you know, it also strikes me as potentially unfair to say that, you know, this is untimely when you previously had a deal to drop your challenge and that deal presumably remained in place until the agency within its discretion decided not to renew deferred action status. I guess you've got me twisted up in knots on your equitable estoppel argument now. Well, and I think that the reason there's this focus is because it is an extraordinary circumstance. It was an unexpected twist of events. And that really falls within equitable tolling. Okay. So let me just ask you a different way. Let me ask you, I'm going to tell you that you are, I don't think there's any way you're going to convince me that, you know, part of why this is unfair is because it was unfair for the agency to not renew his deferred action status. Okay? So what is your equitable tolling argument, assuming you're never going to convince me of that? I just want to make sure I understand. Well, the argument is that because of the deal, he didn't have an opportunity to pursue the motion that had been filed in federal court. And therefore, once that deal ended, his 90 days should begin at that point. And that would give him an opportunity to bring his claim forward in some court. I was reading a Supreme Court decision. Okay, look, can I ask you another quick question about that, about your case? I mean, I see that your time is almost running out. And I want to make sure, I thought you sort of led with this change conditions argument. And do you want to have a chance to address that? I would. Thank you. Judge Chabria, so don't worry about the time, because there's some issues here. And I know there's, and Miki, don't worry either. We'll go get your time and such. I do, both are very interesting issues. And I definitely want to talk about change country conditions. But if I can ask one more question about the equitable tolling. I think Judge Chabria has a really good point about it's very difficult to say that somehow years later when they just didn't renew it, that that was breaking some deal. Because it just wasn't the deal. But it seems to me like the deal was, even focusing on what the deal was at the time, the deal was he had an appeal going, if I recall, right? And he voluntarily dismissed that appeal in order to, for something. Well, what did he, I think the key is, what did he trade it for? And it seems to me that he traded it not for some certainty that I won't be removed ever, or that I'll even get a lot of process before I get removed. He traded it for deferred, for a deferral of that removal that was a guaranteed year, I think, and a possibility of more. And so how can that equitably toll you if he got what he, he got his deal. He got a lot better deal. He got his year and he got more, but he didn't really actually, you were making it sound like his deal had built into it some implicit idea that he wouldn't get sent out unless he committed a crime or something. I just don't see how that's anything in the record supports that. Oh, I do believe that was the deal. That was our understanding. I believe that is how we understood it, that they would not put that in writing, but that that was our understanding of how that was going to go forward. And it did, in fact, happen that way until arbitrarily in 2017. And it was actually quite interesting because the ICE agents called me and they were very sorry that they weren't able to. It had been made by a completely different branch of government to just support everybody who was on deferred action. They didn't take into account the deal that we had at all. Okay. Now it's helpful to have your argument. Judge, do you have any more questions on that part of the argument? And then let's go ahead and hear if you don't mind on the changed country conditions. Well, in 2009, before the immigration judge, Mr. Bautista did not request asylum. This is because there was not a lot of evidence of discrimination against HIV-positive individuals. On the record, you'll see we had a lot of anecdotal evidence. Okay, I'm sorry. I don't know how you can possibly say that, that there wasn't a lot of evidence. It seems to me like he primarily relied on this declaration of Dr. Barnes. But Dr. Barnes had entered a very similar declaration in the 2013 case that's cited in the – I'm forgetting the names of the cases that's cited in the en banc cases by the court. If you actually go back and look at that very similar declaration, she pretty much says exactly the same things, except for there she actually, like, and the period she's talking about is 2000 to 2009. And so it's not true, I don't think, that – and then if you – and actually there's a footnote that talks about increased danger. I think it talks about double the number of homicides or something like that in Mexico for that same time period. Again, that's from, like, 2000 to 2009. So it just – I don't think it's plausible. I don't think Dr. Barnes' declaration in this case actually supports that conditions worsened since 2009 to now. It certainly doesn't support what I think you just said, which is things weren't that bad back then. We did, in fact, present some evidence at the time of the hearing, and there was some evidence. And I think that the report that Dr. Barnes presented now does show a worsening of conditions and shows – Worsening from – I just want to be real clear. Worsening from when? Because there's definitely this backlash theory that worsening conditions is a theory, and there is some evidence of that. But all I could find in looking at her other declarations and such was that this backlash theory has been a theory for the time period that she's comparing back to the early 2000s. You see what I'm saying? If that's what's going on here, then that doesn't actually show changed site conditions. You'd have to show not just that things got worse from 2000 to 2009, but that things actually got worse from 2009 to now, that they're worse now than they were from 2000 to 2009. I'm not seeing that in the record. Well, and she really clearly does. She talks about the 2010 and 2015 law changes that created a backlash. Just to be clear, she – again, and I've looked at this. I'm glad we're having this conversation. She does talk about two events that happened in those years, but she doesn't actually give the evidence of – there were events that happened before that too, events that she had talked about in her earlier declarations that had to do with earlier periods. So she doesn't actually tie the backlash to those events. She doesn't actually show that there's gotten any worse because of those events. Again, the declaration reads just like her earlier declarations that talked about backlash from 2000 to 2009. So I get that she talked about two events that happened, and she says, without any evidence at all that I can see that there was backlash to that, but I don't see any evidence of any backlash to those events. That there were no other reports? Because there's the 2013 report that talks about the 40% of slashing in funding that clearly made conditions worse. There are clearly more reports. When we looked at this in 2009, the number of reports were exactly what was happening, and, in fact, we ended up using evidence of – Remember, though, it has to be changed country conditions. It can't just be we've got reports of continuing bad. Like, for instance, I think actually the country report for 2016 that you referenced somewhere, or maybe it was Dr. Barnes' reference, talks about discrimination persisting. It talks about – and even actually Dr. Barnes' report talks about that. So, again, it's not good enough, I don't think, for me to change country conditions. It has to have gotten worse from 2009 and not just continued to be worse since 2009 than 2000. So I'm struggling to see the things that have actually gotten worse. Well, I do think that the two laws that passed, 2010-2015, are clearly linked to the backlash against – she does say that. She even says it. I'm sorry, but she even says that this is a non-intuitive or, what's the right word, paradoxical conclusion. Because you realize the two laws you're pointing us to are gay marriage and some other – a lot of it would be considered to be a positive development for individuals. So just simply pointing to those laws is not good enough. You have to actually point and show us the backlash, I think. You have to show the BIA the backlash. Because, after all, we're reviewing and say, did the BIA abuse its discretion here in saying that you haven't actually – because that's what the BIA said. They said, you've shown that there's still problems in Mexico, but you haven't shown they're worse, essentially. So I don't think you can just cite to the laws and say, hey, these two really good things happened, therefore there's a backlash. You actually have to show us the backlash or show the BIA the backlash. Well, it is her declaration that because of those laws that things got worse, ironically, for HIV and LG. It's the same thing she said in about the 2000-2009 period. It's pretty much a cut-and-paste job from the other declaration. And in that one she actually did point to some statistics for that period of time. In this declaration she didn't. It just purely concludes her. This time she reports the 2013 report that there's a 40%. And there's ongoing slashing in funding. And I think it's true that she does get into detail about how much less funding there is now for HIV. These are the links to worse conditions for them. She showed that since that time the funding has decreased significantly. That's clearly a worsening of conditions for HIV. Can I ask you a follow-up question on that? It seems like the discussion you're having with President Indyk is you may be disagreeing about the extent to which Dr. Barnes' declaration is credible and possibly disagreeing about whether there's adequate evidence to conclude that conditions have changed for the worse in Mexico. And as I sit here I'm not sure I know what the answer to that debate is. But I thought, you know, I know that certainly in the history of our country we have seen, you know, gains made by the LGBT community, legislative gains, and that is followed by backlash. And that is a thing. I don't know whether the assertions about what's happening in Mexico are true. But I thought that we were considering the denial of a motion to reopen here. And I thought that the test for that was that, you know, if the BIA gets a declaration, the BIA is supposed to credit the assertions in that declaration unless they're inherently unbelievable. And that if the BIA doesn't do that, the BIA is at its discretion and you have to send it back. So it seems to me the real question here is not whether Dr. Barnes is right or wrong. And I'm not sure you'll be able to convince any of us that Dr. Barnes is right. I just don't know enough about it. But could you really say that Dr. Barnes' declaration is inherently unbelievable such that the BIA could reject it? And then I guess a follow-up question to that is, did the BIA actually conclude that the declaration was inherently unbelievable? Or did the BIA just sort of disagree with the merits of the declaration? Well, I agree, Your Honor, that the question is how the BIA characterized the evidence. And I would suppose that they mischaracterized the evidence. For example, stating, oh, those PTQ laws were passed. Therefore, it shows that the government was not unwilling or unable to help them. Maybe they mischaracterized the evidence. Maybe they didn't. But I almost wonder if that's beside the point because they were supposed to accept Dr. Barnes' assertions as true unless it reached a conclusion that they were inherently unbelievable. And I don't – did the BIA reach a conclusion that the assertions are inherently unbelievable? Or did it just conduct the weighing of the evidence and decide that it disagreed with Dr. Barnes at the reopened stage? What they did was they cherry-picked the evidence and they just used what was in their favor without considering the other evidence that talked about worsening conditions. So, counsel, let me push back. I'm looking at it right now, the BIA. And it's what it says. It says, we do not find the respondent's motion warrants reopening. The respondent's evidence indicates ongoing discrimination against and individuals in Mexico, not conditions in Mexico – not that conditions in Mexico have worsened in this respect since his hearing in 2009. So, to be very clear, the BIA did not say we don't agree that there's bad conditions. And the BIA also did not say that we don't agree – we disagree with this backlash story. What the BIA said is we don't see any evidence that you provided that conditions have actually worsened since 2009. And so then when you go and you look at Dr. Barnes' affidavit or declaration and she says there's this backlash theory and conditions have worsened in Mexico, that's not actually inconsistent with the BIA here. Because, like I said, there's no question that Dr. Barnes has provided some evidence that conditions have worsened. The key question becomes worsened since when? Has it worsened since 2009 or has it worsened since 2000? And if you actually look at what she has said before and you actually – she doesn't say when it's worsened since. And that's what the – and so if you were to – if I was to conclude looking at it and say she definitely said conditions have worsened, but they haven't worsened since – she does not anywhere say that they've worsened since 2009. She simply points to these two other positive events, but she doesn't actually have any. She just says they've worsened. And if you look at her earlier ones and she was using – she was using it as a comparative early date, 2000, then I don't see how – why is it wrong? I don't see the cherry picking that you talked about and I don't see her disagreeing with what she says. They're just saying she hasn't said it's actually worsened since 2009. Well, Ron, I respectfully disagree. She specifically says that, you know, quote, it can cause – that because of the progressive policies adopted in 2010, 2015, it has caused conditions for HIV-positive individuals to, quote, become increasingly more perilous as a still conservative public and authorities generate backlash by violently pushing against the gains. She specifically points that in her declaration. How will it become more perilous? Administrative record 90. AR 90, paragraph 51. Thank you. Yes, I think that's the best line for you, that first sentence in 51 where she says despite some – you know, and frankly, when I look at this and I compare it to her old declarations, it looks to me like she's just saying the same thing she said before. She provides zero evidence of that. She provides zero evidence and so it looks to me like – I mean, and you could also read this to say that it's become more perilous but become more perilous since when? Again, it's become more perilous since – in other words, is it worse, worse, or is it just worse? Is it the same worse that we had in 2009? And there's nothing in here that tells me that other than if you just want to read her as having read it that way, I guess. But it seems to me that going to what the BIA said, the BIA said she said there's evidence that things are not good there. But she hasn't – nobody's provided us any evidence that they've actually gotten worse since 2009. And I don't know – it's not clear to me that the BIA's conclusion is wrong in that regard. Well, I think looking at the way – if you look at her declaration, she clearly points out how conditions – she talks about increasing rate of human rights violations since 2009. Those are worsening conditions. And the BIA really didn't consider – Where does it say that? Increasing rates what now? Of human rights violations. Where? That's the 2011 Mexico – What paragraph are you referring to? AR-85. AR-85. She says the 2016 report. Added an increasing rate of human rights violations perpetrated by healthcare professionals against HIV-positive individuals since Mr. Bautista's hearing 2009. I don't have the exact – It's interesting because if you go to the beginning of that paragraph – this is Emma Page before – she talks about there being 570 complaints in 2007. And then in 2009 to 2011, she talks about there being 161 complaints. And then she talks about in the first half of 2011 there being 49 complaints. So it's an odd thing to draw from that, that there's an increasing rate. When I look at that, the rate's going down on that. Now, I'm not saying that complaints is everything or anything, but it just doesn't seem to me that the actual numbers she provides actually show that there's an increasing rate. And if you look at the very next paragraph, when she actually cites the 2016 annual report, she says that Mexico's National Human Rights Commission continues to note the persistence. Again, not that it's getting worse, but that it's continuing. The same thing that the BIA said here. So I think what it comes down to is it looks like she wrote this declaration to try to support this backlash theory in this case, but I don't see anything that actually shows that things have gotten worse since 2009. I think that's probably the conclusion the BIA drew. But, you know, that's my reading of this. I'll have to look at it some more, I guess. I do think that they don't consider all of the statements that she makes that do support worsening conditions. I mean, it's true that she might've written the report with this in mind of the 2009 date, but she definitely points to specific instances of worsening conditions and just the funding itself. She shows the cutting in funding is part of the worsening conditions. That's not considered by the BIA. I think they should need to consider that as part of the change in conditions. Well, thank you, council. We took you for a long time, but I appreciate it. Some interesting factual things in this case. You used up all of the time. So we're not going to give her anything. I'm just kidding. Yes. Go ahead. How many minutes were you going to have? I've forgotten. I was going to have four minutes, but I can be brief. I don't want to take away your four minutes. Thank you. I'm Kristen McLeod ball for Amici American immigration council and the Catherine Greenberg immigration justice clinic, a part of the school of law in support of Mr. I am going to address the BIA March 9th, 2018 decision, denying Mr. Motion for a stay of removal. In this case, The BIA applied it's unlawful practice of adjudicating stay requests without considering relevant factors, ensuring that against are aware of the standard for such requests or providing reasons, decisions, and violations of the judicial constitutional statutory and regulatory rights. That violation is especially problematic in cases like this one. As an individual seeking reopening, as, as you've just been discussing with, with Ms. And Ms. Hecht is requesting remand so that the board can consider arguments and evidence that it didn't consider in the first instance. Counsel is your, is your principal, is your principal complaint that the BIA didn't explain itself. My principal complaint is that the, the, the process overall. Fails to take into account necessary factors when adjudicating. Okay. Well, if you present, you presented all of your evidence for that. Right. And the BIA looked at it and denied it. So what's the problem? Of course, your honor, the BIA denied the. Stay requests stating that they didn't believe there was a likelihood of success in the merits, but the likelihood of success in the merits cannot be the only consideration when addressing a stay. The Supreme court has told us that is the principle that is, that is the most important issue of the, of the factors that we use in declaring a stay. So I'm, I'm trying to figure out what the, what the, what the problem is. And I thought that your argument basically was the BIA is not explaining enough when it denies. That's certainly an element combined with the fact that it hasn't put made publicly available the standards that it's using to adjudicate these requests. If it had not said, if it had, if maybe the BIA problem was that it said too much. If it is just that the stay is denied, then you, you would be, would you be okay with that? Our concern here is the overall process that the BIA uses to adjudicate the request. And so, and what's the process, what's the object, what's the objection to the process? The objection to the process, as I was saying, is that the BIA in essence does a rapid fire adjudication of the merits of a case that has never been presented to an adjudicator before. Counsel, that is, that is true of every state request that this court gets. I'm very concerned about the collateral consequences of your argument. This has a great impact on, on, on, on us as well. If there's a constitutional right, which, which is part of your argument. So I'm trying to figure out what the BIA is supposed to do because we get requests for stays in immigration cases and lots of other things, labor disputes, property foreclosures, and we issued one line denial for those. So I'm very, I'm very concerned about a constitutional argument about the process and that the BIA didn't do enough because I'm afraid it may have an impact on us. So I need you to tell me why we're doing it wrong as well. I'm not arguing that you're doing it wrong as well. I, the, you know, the ninth circuit has their process laid out whereby under the daily on stays folks get a brief automatic stay to give the court time to adjudicate the full stay request, ensuring that there's not this sort of rapid fire adjudication that I was talking about would be BIA's process. Additionally, when this court looks at a stay request, it's looking at a claim that has already been adjudicated by a prior adjudicator. What we're talking about here at the BIA is a stay request associated with the motion to reopen, which by definition presents new arguments and evidence that have never been looked at by an adjudicator before. So therefore, under the BIA process where they refuse to look at an urgency stay until between 24 and 48 hours before a person is physically deported from the United States, they're taking a first look at claims that present a life or death issue for folks and not looking separately at the harm that can result from a stay denial, separately sort of from the merits of a request. And this court does not do this, right? In M10, the Supreme Court has made clear that you're not looking exclusively at the merits, right? That that would infer the process. So it's a two-pronged concern whether an individual is going to be, an action is going to be taken too quickly for someone to, for the court to fully adjudicate the merits and whether that quick decision will cause irreparable harm. And that's not what's going on at the BIA where it's even more urgent to do so because these are fresh claims about asylum, in this case about an asylum application for changed country conditions that's never been looked at before. So, so what is it, what is it you think that the BIA is obligated to do? I think that the BIA is obligated to consider more factors than, than exclusively the, sorry, the, like the petitioner's likelihood of success on the merits. Well, that's your, that's your fundamental claim. It sounds like. That's the claim that in theory would help judge Vibey feel better that we wouldn't overturn all of our, because we might have more of a standard than just the one factor. So it sounds like, is that right? That's your, that's your fundamental claim. They need to give you, they need to tell you what their standard is. Is that, and it needs to be more than one thing. Okay. I think. For the record, I'm in favor of making it harder for the ninth circuit to stay district court. You've got, you've got, you've got all the interest. Represented in this panel. All right. So any, any other questions, judges? All right. Well, miss, miss miles, we're going to move over to you. I'm, I'm going to exercise the project to ask you, if you don't mind right off the bat, let us know why you filed the thing you filed last night. And what I'm still trying to figure out what implications that has for this case. I do know your appointment council is not happy about it. Yes. The implications are that he now has a superseding order of removal from April 17th of 2018. You know, so this case. Before the court was about, he had to leave under his 2010 removal order. He left in March, 2018. He then subsequently tried to come back many times and he has subsequently been subject to multiple other orders of removal. And what's important here is the fourth one that has since been executed on April 17th, 2018 is now subject to reinstatement. And under the law, that means I need it. I know that they're moving to reinstate it right now under the law. That means he is ineligible for any relief from removal because he has broken the law. For withholding of removal panty. I mean, that's one of the things that I was forced to go do some research on. Absolutely. But he presented, well, you know, this came up as part of his stay of removal that he filed with this court, which this court granted. He, he necessarily came back unlawfully and then asked this court to say his removal. So that kind of, that's yeah. But in the meantime, it seems like we have a couple of like, first of all, it sounds like that even if there was a reinstatement, it's actually, it actually had been reinstated. Then it seemed like that wouldn't necessarily foreclose some of the targets might foreclose out some, but it wouldn't necessarily foreclose all of them. Yeah. Yes. I will, I will, I will keep a close eye on that.  the kind of thing that the police have with my quick and dirty looking at this last night. But, but. One second counselor, at the end of the day. I'm not sure it matters though too much in a sense because we don't, it actually has not been reinstated yet. So I don't know how that could affect this case. And then further, I guess the third question. The third issue that's confusing me on this is. We have to review things on the record. That's in front of us from the BIA. So I don't know what we're supposed to do. I mean, can you tell us what you want us to do with this? Well, for one, there's no remedy here. Given, given the subsequent. Acts of unlawfully coming back. He's here. So he's seeking a remedy about his stay of removal by the board, having been denied, but. It's pretty much mooted out because he has come back and he, his whole due process argument was that. I was trying to think about this. Is it really mooted out in this for our purposes? I understand you. You're like, they've got a whole. I've got a whole handful of removal orders and you'd have to win on all of those. And some other stuff in order to keep me removed. But I think his argument would be as a, as a theoretical matter. Well, maybe I do, but I asked to win on this one as one of those. And so it doesn't move this one out necessarily. It may mean that he's got a huge mountain to climb. But this is part of the mountain. It seems like, I don't see how it's necessarily. Move. Go ahead. Yeah. Has he been charged with a crime? No. Okay. Then why isn't this a matter for the BIA to decide? What, why, why are you asking this court to decide something as a matter of law at this point on, on your 28th day letter? Then why don't we just let the BIA decide, decide what the implications of this are. If you haven't, if you haven't turned him over to sue for prosecution. What. What we're trying to get at is there, There are just additional reasons. To the board here based on counsel. Claims as to the board. Alleged errors or alleged, you know, abuse of discretion that the board now lacks the ability to provide. The remedy. Of removal or asylum. Council you've got, you've got two problems. So. The first problem is, is that was not the basis of the board's decision. And so under Orlando Ventura, we should have to remit it to the board to allow them to decide that in the first instance. Right. I don't disagree that it's just an additional explanation because he, again, he. If what you're doing, if counsel, if that's true, then that we should remand under Orlando Ventura. And allow the board to decide that the mountain is too high for him to climb. And that's an independent reason for dismissing him. That that's fine. But by you raising it here. And then saying, this is an additional, you know, this is additional atmosphere. As to why you should deny his claim. I think that's a low blow. That's unfair. Oh, I, I understand. If this wasn't coming as a low blow, this is coming to explain to the court, which the court often asks us. When we appear for argument, because these cases have gone stale for a while. Much has happened to provide the procedural history here. And the court has asked us to make the case. And the court, and he, this, this court, the ninth circuit granted him a stay of removal. Based on. Him saying that he filed an application with us. So an affirmative application for asylum. So he got a stay of removal from this court. I think that's a low blow. I think that's a low blow. Based on his coming back to the United States. And having filed that application. And as we said. At that time, without knowing about these other removal orders, we informed the court that his 2010 order would be subject to reinstatement. And that would therefore mean that he's no longer eligible for asylum. And that's the reason the court should deny stay of removal, but also just to let you know that he's not eligible for asylum anymore or cancellation of removal. So it came up because his counsel. Filed a motion for a stay of removal and got a stay of removal based on his representation. Based on the representation. Counsel. I hear all this and I think we all probably were aware that this may have. Implications for various things. I guess. I mean, the state of removal has already been granted. That's what was confusing about the letter. You sent the letter and have this information, but you're not actually asking for anything from us. And so I think we're wondering. It can't be. I don't think you're asking us to reverse the stay of removal. Based on this. No. What is the. No, we're not. What should we do with. Okay. The purpose is to update our representations in our opposition to the state of removal. Because our representations were that the 2010 or removal is subject to reinstatement and that is no longer the case. So because he has had these other procedural encounters and removal orders. So it's to update you that what is now subject to reinstatement. And that is still, that remains true. Is this. April 2018. Order of removal that is now subject to reinstatement, but. To say also still that if this were to be remanded to the board. It's just to sort of lay the foundation that some of these other claims that he's trying to get a remedy about are no longer. Available to him because. I'm not quite sure. They're not saying they're no longer available. That's part of the problem. It's not that they're no longer available, but that you expect that if you get the, that, that if you, if you get reinstated, then they would be no longer available. I mean, it's just sort of not even right. So what are you, are you, if he, if it is reinstated. Before we issue an opinion, I'm trying to figure out like how this affects anything. If it is reinstated, do you want to let us know? And then. I'm still not sure that would affect anything. I think if we send it back to the BIA, they would take it into account. I would, I would qualify my answer to you, depending on how you decide the case. If you were. Yeah. And I would like to get to the arguments of the PFR at hand, but. If you were to, after, after all of this, decide that it should be remanded for consideration of whether or not you should change country conditions, such as you could apply for withholding of removal or cat. Or, or, or even asylum, then I would. Of course offer to let you know if it's reinstated. So, you know, asylum and cancellation are definitely off the table. That's. It's just to try and keep everybody's actually in the loop as to what could happen on remand and the reinstatement is going forward. That's what I. According to the office of chief counsel in Seattle yesterday. But if you don't have any other questions about this, I will turn to the merits of what you were asking about. You know, this is, this is not about. Whether or not he's eligible for asylum. That's not what the board was looking at. This has never been about his eligibility. It was about whether or not he met the standards for reopening. There's no question. Could I ask you a question about that? Do you agree? With what I said earlier that the law of the ninth circuit, at least. I haven't looked at the other circuits, but the. But one longstanding law of the ninth circuit. Is that when considering a motion to reopen EIA has to. Accept the factual allegations in these kinds of declarations. Unless they are inherently unbelievable. I don't, I don't disagree with that. And I don't. I don't know whether. So the question for us. As it relates to the issue of changed conditions. Is whether this declaration submitted by. Dr. Barnes is inherently unbelievable. Right. And I guess the second question, or maybe the first question for us. Is did the BIA apply that standard? Or did the EIA conduct a weighing of evidence at the motion to reopen stage? And concluded concluded disagreed with Dr. Barnes. So. That would sound like it was more of a merit based assessment. But here, here, I would say from the BIA decision. We can to answer your first question. We can glean that it accepted Dr. Barnes's statements for what we're, what we're sad. Took it as credible. As. As. Did not find it incredible or unreliable necessarily put it that way. But the standard for getting around the 90 day bar here and showing change country conditions is, are they material to someone's eligibility for asylum? And are they qualitatively different than the time of the hearing in 2009? So the board's evaluation of Dr. Barnes's statements about ongoing persistent conditions. And then the backlash theory. Is, is in relation to, you know, that day in 2018, when the motion was filed, how did that compare to conditions in 2009? That it had that, that petitioner submitted petitioners burden to show a material change, such that he is now eligible for asylum wasn't in 2009, because he chose not to apply them. And. Are they qualitatively different from that 2009 period? The board looked at Dr. Barnes's affidavit and did not find that the conditions described there by Dr. Barnes, talking about this extensive period in time from 2009 to. Perhaps present day, but we don't have the specifics. As judge Van Dyke kept pointing out. We don't have any specifics. But I do agree that we don't have a lot of specifics in here, but it's a declaration from. Witness declaration is itself. Right. And. That is the declaration that the BIA is supposed to treat as. Correct. Unless, unless allegations are believable. But it's still, it's still a burden of showing a material difference. And as you know, we went through the various paragraphs of the doctor's affidavit. There's no showing that this backlash. Somehow. Quick condition. Back to as bad as they were in 2009. It just says there's a backlash of improvement. What improvements and who is the backlash by? Was it by individuals or was it by public officials? Because it sounds like a lot of public officials are making many, many steps and inroads towards progress since 2009. I get your, I get your point. Ms. Miles. And the point I think is the declaration is not all that convincing. There may be. Material. Either in the record or in the record of some other case or in, you know, Other other reports outside the record that sort of undermine the assertions that are made by Dr. Barnes. I guess what you are saying now sounds like you're, you're sort of disagreeing with the assertions that Dr. Barnes makes in her declaration. And that is similar to disagreeing with the assert assertion is more. I'm sorry, I didn't. Sorry. I know the connection is. I apologize. Finished my question real quick. It sounds like what you are doing and what the is doing is saying, we don't, you know, we don't agree. With this, with this, with the assertions that this witness makes in a declaration and maybe you're right, but I'm just trying to figure out if the correct standard was applied by the BIA, the standard that BIA is required under nine circuit law to apply. I don't really want to be clear. That's not what I took you to be saying. I didn't take you to be saying that. I actually took you to be very carefully. I thought saying we don't, the BIA did not disagree with her. It's just that her report did not show change country conditions from 2009. She talks about this backlash theory. She talks about things are worse, but she doesn't, but obviously this backlash theory has been around for a while. Pre 2009. She doesn't actually talk about it being worse since 2009. And as I read the BIA basis, it's actually, it doesn't discredit her. It just says that they haven't, that they don't show that conditions in Mexico have worsened in this respect since his hearing in 2009. So I just want to make sure you're careful what we hear, what you're saying to us, what are you saying to us? Yes, that's exactly it. As I, as I did try to convey earlier, the board credited what was said, it just didn't find it to be sufficient to show. It's kind of like the corroboration we were talking about earlier. It just wasn't enough to meet the burden of showing a material change from 2009, you know, between 2009 and the present day, because the record as established from 2009 and the conditions shown then already. And also within the affidavit itself don't qualitatively seem any different than the present day conditions. And, and, and again, we're talking about persisting of discrimination, you know, materiality, as I tried to point out earlier, it's to the elements of asylum, you know, materiality. Can I ask you a real quick question? I'm really curious. I don't know. It's literally something I don't know the answer about. So I understand. I think, I think Javier's made a good point that, that you don't, the BIA in this posture does not get to, yeah, I, I must say, unless they go out and say it, they don't get to say, we don't like the, they basically have to take the evidence that's given to them. And it's limited every type of proctor. But it seems to me like the issue here is a slightly different one in that they, it's what it's, it's a reading. It's an interpretation of Dr. Barnes's declaration. What is she saying? And, and I don't know what the answer is, is how, what kind of deference do we give if any, to the BIA on their reading of her declaration versus how we might read her declaration. Again, assuming the BIA is not saying she's wrong. They're saying we didn't read her declaration to meet this evidence- sharing standard. Is there some, any deference we give on that or not? I don't know. Your standard of review, because this is a motion to reopen context is whether or not the board abused its discretion, you know, change country condition standard that we're talking about here, whether or not he met his burden of showing material change country conditions is, is, is to get over the 90 day statute, you know, statutory limitation for filing. So this is all within the universe of whether or not the board abused its discretion in evaluating this evidence. And, and, and mind you, don't forget that we also have a 2016 country conditions report that they submitted. They did not submit the 2009 report, which is what we typically see for motions to reopen. What was it at the time of your hearing? Submit the report. What was it now? Submit the report. All we have is a 2016. It doesn't talk at all about HIC individuals specifically being targeted. It talks about the LGBTQ community, which counsel has said, you know, because you have HIV, you will necessarily be viewed. So look at what it says in 2016 about the treatment of the LGBT community and the state department 2016 report. And while it talks about perhaps, you know, there's ongoing discrimination, but there's also been an increase in tolerance, but very, something very notable here is there's nothing about the government. Acting against these individuals, much less with impunity. And while we don't have the 2009 report in our record, we do have it discussed in a case that counsel brought up, which is the bring us Rodriguez case. And in, in your on bond bring us Rodriguez. You talk about the 2009 2010 reports and it spoke in 2009 about the government acting with impunity in certain instances against this community. So, you know, if you were to compare 2016, 2009 reports, which this court uses the best evidence, and it has said it time and again, that's evidence of country conditions. And we don't have the report in the, in the record, but we have bringing this talking about it. When you compare the country conditions report, there is a marked improvement between 2016 and 2009. So not only is it not just the same, according to the state department, it's, it's still viewed as improved based on how they describe the condition. Right. So we're about five minutes over and, but I, I don't think. Okay. The Mr. Bautista has made two arguments here. One is that the, is that he was entitled to equitable tolling. And the other was that he was, and that the BIA was not sufficient in its, in its, in dealing with its, his motion to reopen. If we were to agree with either one of those, does this have to go back to the board? And if so, is the procedure different when it goes back to the board? So let's suppose that I agreed with the government on the, on the question of the motion to reopen and that, and the significance of the Barnes report. But I disagreed with the government on the question of the propriety of equitable tolling here. What, what, what happens now? The board did not address it. So I think if you think it was properly raised, which our primary argument is that we did not raise it to the board. So if you think he did raise it, then the board would have to, you would, we would say that you should remand for the board to address the standards, whether or not he met the standard for equitable tolling in order to get over the untimeliness finding that I found about his motion. So we would not, we would, we would. Does Bautista have to win on both of those points or does he, can he just prevail on the one? If he prevailed on, if you found that he properly raised equitable tolling and the board failed to raise it and you were to remand the, then if the board would first have to decide, did he meet the standard for equitable tolling? If they found that he did, then his proceedings could be reopened. But, and that's where all the reading statement stuff comes into play. Forget the reading statements. Right. Okay. That's all the stuff that you'll argue that you'll argue about. Can we just, can we decide the equitable tolling question? Can we, can we say under these circumstances, there had to be equitable tolling as a matter of law? No, because the board didn't have an opportunity to address it. The board didn't address equitable tolling. The board said that he, he, he raised an argument that his motion was timely because he exercised diligence after DHS declined to renew his deferred action. But he, and he raised, he raised the claim about acting with diligence after deferred action is no longer granted, but it was couched in terms of that. His affirmative argument was that should be viewed as the final removal order that triggers the 90 day. That is, that is a very different and an independent argument than equitable tolling. Equitable tolling is the nine, you know, hold the proper 90 days period. You know, we, the final removal order here was from 2010, April of 2010. And, and also, you know, this is a counter or side argument here, but I want to address it because I know Judge Chavria was interested in this about him withdrawing his PFR. His PFR was filed in 2010. The 90 day period from that final removal order came in July. Hold on a second. I thought it was withdrawn in 2011, July 2011. Exactly. So here's my point. PFR filed within the 30 days of the final order of removal, final order of removal, April, 2010, he filed his PFR 90 days goes by that's July, 2010. That day has come and gone 90 day period, July, 2010. It's not until 2011. He had to file a motion to reopen then for it to be time. You know, the Supreme court's decision in stone says it doesn't, the fact that you file a PFR does not toll the period of the 90 day period for filing motion to reopen. You must separately file a motion to reopen that we have the stone decision saying he has to file by July, 2010 to be timely. That date came and went, and then he withdrew the position a year later in 2011. So there was no reliance. There was no quid pro quo here about a 90 day motion to reopen period whatsoever. And I wanted to clarify that for you because I know you were concerned. So him deciding to withdraw. Can I ask a quick follow up question about that? So if somebody files a petition for review with the ninth circuit after, after they lost with the BIA and they, and then they file a motion to reopen, does that do anything to the appeal? Does it moot the appeal or how does that work? It doesn't moot the appeal. It's a jurisdictional question. So if the nothing happens while it's pending with the board, but if the board were to reopen, then the board has retaken jurisdiction and the ninth circuit, no longer jurisdiction. And we usually, the parties usually agree to dismissing without prejudice. Open is filed and is pending. That doesn't do anything to the ninth circuit appeal, but if the, but if the motion is granted and if the motion is denied, obviously, it doesn't do anything to the appeal. But if it's right, it's granted then that, that either as a practical or a legal matter or both that causes the appeal to go away. Yeah, that's right. And so what you're, so to make sure I understand your argument on the equitable tolling issue, you're saying that, okay. Okay. In July of 2011, they cut this deal. It was brought here on circuit appeal in exchange for in exchange for a deferred status, but the, and it may be, you're not saying this, but I'm, I'm sort of assuming you might say it. Maybe you would say it's unreasonable to require somebody to file a motion to reopen while they continue to have deferred status, because that seems like it would breach the deal. And it could jeopardize the person at it, but none of that matters for purposes of the equitable tolling case argument in this case, because the clock stopped, the clock already ran out a year before this, this deal was reached between the BIA and Bautista. I'm, you know, I'm making a statement about whether it'd be reasonable or not to file a motion to reopen. And actually I would make a statement because if he, if while he's in deferred action status and it's renewed, if he actually were able to get permanent status through adjustment, you know, through marriage and whatnot, or his work, then absolutely file a motion to reopen and try and get back into, you can have that adjudicated. I saw, I haven't researched this carefully, but I saw at least, there was at least one BIA decision where when somebody filed, somebody with deferred action status filed a motion to reopen and the filing of the motion to reopen appeared to cause them to lose their deferred action status. It was a little vague. And it's like I said, it's not something, it's not reached. I haven't reached it, researched it thoroughly, but I would think that, and I hear your point about the first, you know, July of 2010 to July of 2011. I think I understand that argument, but the idea that if you, starting up, starting July, 2011, I mean, the idea that you would require Bautista to file a motion to reopen, any time before his, he loses his deferred status. I mean, that sounds like that. No, I'm not, I'm not saying that at all. Okay. The requirement here cut off in July of 2010. Okay. So we're outside of the statutory filing period. So if it had been a situation where in that, in that first 90 days, you know, after he lost with the BIA and let's say he files his ninth circuit appeal, you know, in that first 90 days, he had cut a deal with the BIA to drop his appeal in exchange for deferred status. Then you would say the clock stops at that point, once they reached that deal and it remains stopped until he loses his deferred status. I wouldn't say that unless that was a specified part of the deal, but that, those are not the facts of these cases. So a motion to reopen. You can't ask somebody to file a motion to reopen once they've been given deferred status in exchange for dropping their fight against the BIA. You can, because it has to be new, new facts that were not previously available as part of the lower case. That's the reason to file a motion to reopen. You know, you can pursue the PFR that's challenging the board. The motion to reopen is about something brand new has happened. I'm now eligible for release that I wasn't. So if that came up within the 90 days and you had deferred action within that 90 day period, but you're eligible for something new, like adjustment of status, you absolutely file a motion to reopen because that's an opportunity for permanent status. But you also had a question about whether or not deferred action was an end by virtue of filing a motion to reopen. And that's up to Homeland Security. That's not some sort of rule that's under the board and how you adjudicate motions to reopen. So I can't speak to, you know, the board would not even say that deferred action is over. It wouldn't have that authority. That's purely Homeland Security purview whether or not they would say you broke a deal. But again, it's about the terms of the deal, but none of that was here. You know, the 90 day period came and went in July, 2010. So anything after that was always going to be an untimely motion to reopen. And we had, you know, an eight year period before we got a motion to reopen here. So, you know, after equitable tolling of, from July, 2010, they, you know, one, I don't think they raised it to the board. Two, if you think they did, you should send it back and let them evaluate it. But I don't think you need to do that here because it's not just about diligence. You have to show there's a standard. And council called it exceptional circumstances, but that's not this court standard. You know, the court, the court standard is that it relied on some sort of misrepresentation or fraud by the government or that it was unable to find out about the statutory filing deadline by no circumstances of their own. You know, there's an extreme standard that they have to meet before diligence is even something of a consideration for equitable tolling. There has to be specific types of circumstances. And here it wasn't even reasonable to rely on deferred action lasting indefinitely because it was very clear in all of their notices. Why? I think we, I think we have to have your, you understand your argument and it's just a tad long, but, but judges, I don't want to cut you off if you have any more questions in it. All right. I just wanted to address the state, the state standard, but if you don't need to hear from us, I don't think I won't. Okay. Okay. I don't think so. I think, I think we probably should give a little bit of time. She probably didn't have anything to say in response. I'm assuming. We'll put two minutes on the clock and hope that, and you know, which is a vague hope I'm sure, but we'll go ahead. And I do want to dwell on my two points, but the first is that the BIA did not address the equitable tolling in any detail, did not provide any analysis. Analysis that Ms. Miles provides is not discussed in any way. And I think they would, she would say though, that's because it wasn't raised. I mean, they were really addressing something else, but I, and of course, I would say it absolutely was raised and they recognized it in the footnotes. So because of that, they should have had a more in-depth discussion. And that's why this court should remand it and ask them to do that, to apply the principles and standards. And we can have that argument there. Counsel, do you mind? I was wondering, you know, cause I didn't ask you about this new material that was filed last night. Do you have anything to say about that? I mean, you don't have to, but is there anything you want to respond on that or what do you, what do you think we do with that? If anything, I think you ignore it. Okay. No, that's fine. I thought you'd say, but I just want to make sure that that's what you thought. Absolutely. We still do have arguments. We, we have plenty of things to say about the, the removal orders itself. And I would like to just comment that we did file our motions before we had received information from the foyers. So what's not brought up, but having, when we did, we did receive that information at some point, and I don't think it affects this case in any way. I would like to ask that you not have it affect you. Mr. Bautista remains a person who's lived here for almost 30 years with a legal permanent resident spouse and six US citizen children. So we still want to argue why he should, his case should be heard. And I would like to dwell just one more minute on the country conditions issue, because I don't think the BIA addresses, I don't think they look fairly at Dr. Barnes's report. And they need to, I feel that they cherry picked what they wanted. I asked this court, take a look at the declaration. It really does discuss worsening conditions. Discusses from 2009. I really do believe that if you look at what she says, that there are grounds for seeing a different situation. Obviously there's been discrimination against LGBTQ people for many, many years and that there's nobody disputes that, but there's certainly been many reports of worsening conditions because primarily because of the funding, but also because of this backlash. And she does specify those dates after 2009. I really ask that you take a look at that. Thank you. Counsel judges. Do we have any more, more questions? No. Thank you all for your, this is a long argument, but there's a lot of very interesting and challenging issues, but thank you all very much.
judges: Bybee, Vandyke, Chhabria